FILED
Apr 29, 2025
11:54 AM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Heather Allen | )    Docket No.    2023-06-7576 |
| | ) |
| v. | )    State File No.   44213-2023 |
| | ) |
| Deliveries via ISG, LLC, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Joshua D. Baker, Judge | ) |

---

## Affirmed and Remanded

---

The employee in this interlocutory appeal was involved in a motor vehicle accident while operating a company vehicle within the course and scope of her employment. The employee's authorized treating physician diagnosed several medical conditions and eventually recommended a multi-level cervical fusion. The employer declined to authorize the recommended surgery, arguing that the employee's preexisting degenerative conditions were the primary cause of her need for surgery. Following an expedited hearing, the trial court determined the expert medical evidence offered by the employer did not rebut the presumption of correctness afforded the causation opinion of the panel-selected authorized treating physician, and it ordered the employer to authorize the recommended surgery. The employer has appealed. Having carefully reviewed the record, we affirm the trial court's order and remand the case.

Presiding Judge Timothy W. Conner delivered the opinion of the Appeals Board in which Judge Pele I. Godkin and Judge Meredith B. Weaver joined.

A. Allen Grant and Benjamin T. Norris, Nashville, Tennessee, for the employer-appellant, Deliveries via ISG, LLC

Brian Dunigan, Goodlettsville, Tennessee, for the employee-appellee, Heather Allen

### Factual and Procedural Background

Heather Allen ("Employee") worked as a delivery driver for Deliveries via ISG, LLC ("Employer"). On April 26, 2023, while she was operating a company vehicle within the course and scope of her employment, Employee's delivery van was rear-ended

by another vehicle, which pushed Employee's van into a ditch.  She informed Employer of the accident and reported suffering injuries to her right knee, back, and neck.

Employee was transported by ambulance from the accident scene to Ascension St. Thomas Hospital West, where she reported head and neck pain, as well as right knee and low back pain.  A CT of the head revealed no abnormalities, and a CT of the cervical spine showed no acute fractures or subluxations.  A lumbar x-ray also showed no acute fractures or subluxations, and x-rays of the right knee revealed no acute abnormalities.  The provider released Employee from the emergency department with diagnoses of lumbar strain, cervical strain, right knee pain, and headache.  She was prescribed medications and instructed to follow up with a primary care provider.[1]

Employee was evaluated by a physician's assistant at Sport Ortho Urgent Care on June 21, 2023.  Her primary complaint at that time was neck pain.  She described a "progressive worsening" of symptoms following the accident, and she rated her average pain as between four and six out of ten.  She also reported radiating pain in her arms with numbness and tingling in both hands, which were worsening with time, as well as intermittent headaches that worsened throughout the day.  She denied any neck surgeries or treatments prior to the work accident.  In addition, Employee reported that she had been terminated by Employer because she was unable to tolerate driving or loading vehicles after the work accident.

A cervical MRI was completed in September that revealed a C4/5 anterolisthesis with spondylosis resulting in severe canal stenosis with spinal cord deformity.  It further showed multilevel cervical spondylosis with severe canal stenosis at C3/4 and C5/6.

In October 2023, Employee was evaluated by Nurse Practitioner Angela Allen at Ortho Sport and Spine due to complaints of ongoing neck pain, low back pain, and right knee pain.  She denied experiencing any neck pain prior to the motor vehicle accident. NP Allen noted that Employee's cervical MRI revealed "cord compression with abnormal signal at C4/5 with C3/4 cord flattening and at C5-6."  She also noted that the cervical CT showed "[m]ultilevel degenerative changes in the cervical spine."  Employee complained of constant burning and throbbing with sharp pain that radiated to both shoulders and arms, worse on the left.  She also reported "numbness and tingling" in both hands, left worse than right, with no feeling in her first and second fingers.  With respect to Employee's neck condition, NP Allen diagnosed cervicalgia, radicular pain, stenosis, spinal cord compression, and cervical myelopathy.  She prescribed medications and recommended a referral to a spine surgeon for consideration of surgical treatment of the cervical spine.  The following week, Employee was evaluated at Ortho Sport and Spine

---

[1] As the issue in this appeal centers on Employee's cervical spine condition, we need not address any other medical conditions Employee alleges arose primarily from the work-related accident at this time.

again, and Dr. Mark Flood discussed his recommendation for surgery, including spinal cord decompression and a multi-level cervical fusion.

Employee was next evaluated by neurosurgeon Dr. Gregory Lanford, who Employer stipulated was selected from a panel of physicians. In his January 24, 2024 report, Dr. Lanford noted Employee's history of the work-related motor vehicle accident leading to neck, back, and right knee pain. He also commented that "she states she has had no previous similar history of neck pain or numbness in her hand." Dr. Lanford's physical examination showed evidence of diminished range of motion in her neck and a "positive foramen closure testing." After reviewing the diagnostic test results, Dr. Lanford concluded, "I would plan a decompressive cervical laminectomy C3-7 with an anterior cervical discectomy and fusion C4-6."

*Prior Medical History*

Employer declined to authorize the surgery recommended by Dr. Lanford. In support of its position, Employer noted evidence of prior accidents and medical treatment, which it asserted showed relevant preexisting conditions. For example, in February 2015, Employee was evaluated after complaining of left upper arm pain after lifting heavy wire at work. In a February 24, 2015 report, Dr. J. Jordan noted that Employee reported experiencing numbness and tingling in her left arm as a result of the lifting incident, which she reported "will resolve spontaneously in 10 minutes or less." Dr. Jordan diagnosed left arm tendonitis. She was treated with medication and physical therapy. When Employee returned to Dr. Jordan's office the following month, she reported some shoulder pain with radiating pain down the arm. Dr. Jordan altered her medications and therapy regimen. The last report from Dr. Jordan in the record is dated March 2015.

In 2017, Employee was treated for facial swelling and left neck pain. A CT scan revealed a dental abscess involving the second and third left molars. These records reveal no diagnosis related to the neck.

In 2019, Employee reported to Ascension St. Thomas Hospital West with complaints of chest pain and speech difficulty. Her symptoms included left arm numbness and tingling, which then "progressed" to numbness and tingling in both arms and legs, as well as lip tingling. She was evaluated for "stroke-like symptoms," but there were no diagnoses related to the cervical spine.

Finally, in November 2020, Employee was treated at Skyline Medical Center for a work-related injury. She reported falling after being struck by the swinging door of her delivery van. She landed on her left side and experienced pain from her left hip down her left leg. Pertinent to the present appeal, she also reported "chronic neck pain," but she

denied that the 2020 work accident had worsened this condition. She was treated for low back and left hip symptoms and released to follow up with "the workers' comp clinic."

Following a January 2025 expedited hearing, the trial court determined that: (1) the causation opinion offered by the panel-selected, authorized treating physician was entitled to a presumption of correctness; and (2) Employer did not come forward with sufficient evidence to rebut that presumption. As a result, the court ordered Employer to authorize the treatment recommended by Dr. Lanford, including the neck surgery. Employer has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2024). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2024).

## Analysis

On appeal, Employer argues the trial court abused its discretion in giving greater weight to the causation opinion of the authorized treating physician over that of its medical experts and in failing to consider our prior opinion in *Edwards v. Peoplease, LLC*, No. 2020-07-0656, 2024 TN Wrk. Comp. App. Bd. LEXIS 23 (Tenn. Workers' Comp. App. Bd. July 2, 2024).[2]

---

[2] Our opinion in *Edwards v. Peoplease, LLC* is currently on appeal to the Tennessee Supreme Court. On December 6, 2024, the Supreme Court ordered that the case be heard by the full Court instead of the Special Workers' Compensation Appeals Panel, and it directed that supplemental briefs be filed. Oral arguments in *Edwards* are scheduled to occur in front of the full Court on May 29, 2025.

4

*Weighing of Expert Medical Testimony*

Tennessee Code Annotated section 50-6-102(12)(E) states as follows:

> The opinion of the treating physician, selected by the employee from the employer's designated panel of physicians pursuant to § 50-6-204(a)(3), shall be presumed correct on the issue of causation, but this presumption shall be rebuttable by a preponderance of the evidence.

Thus, in circumstances where a panel-selected authorized treating physician has offered a causation opinion, the burden of proof shifts to the party contesting that opinion to come forward with sufficient evidence to convince the court that the preponderance of the evidence regarding medical causation is otherwise. Here, Employer stipulated that Dr. Lanford was a panel-selected authorized treating physician. Dr. Lanford testified that the work-related motor vehicle accident was more than 50% the cause of the need for the cervical spine surgery he recommended. Pursuant to section 102(12)(E), that opinion is presumed correct, and Employer had the burden of rebutting that opinion by a preponderance of the evidence.

In *Edwards*, we considered a similar factual scenario, but in the context of an appeal of a final compensation order. The employee in that case was also involved in a motor vehicle accident while operating a company vehicle. *Id.* at *3. She reported suffering injuries to both knees resulting from the accident, and the treating physician eventually recommended total knee replacements. *Id.* at *4-5. Unlike in the present case, however, the panel-selected authorized treating physician opined that the employee's need for total knee replacements arose primarily from her "severe, bilateral end stage osteoarthritis," which he said preexisted the work accident. *Id.* at *5. In an effort to rebut that presumptively correct opinion, the employee offered testimony from other orthopedic surgeons, who opined that the need for surgery was caused primarily by the work-related accident. *Id.* at *8-11. One of the employee's experts testified that the employee was asymptomatic prior to the work accident, and the accident hastened the need for the surgery. *Id.* at *9. The trial court in *Edwards* gave greater weight to the opinion of the employee's experts and awarded the employee benefits, which included ordering the employer to pay for the total knee replacements. *Id.* at *13.

On appeal, we were divided. A majority of the Appeals Board concluded the trial court had abused its discretion in accepting the opinions of the employee's experts over those of the authorized treating physician. *Id.* at *25.[3] As a result, we reversed the trial court's order awarding benefits. *Id.* at *35.

---

[3] In the current *Edwards* appeal, the Tennessee Supreme Court's request for supplemental briefing pertained to the applicable standard of review on appeal when the expert medical proof is presented by deposition or in documentary form as opposed to live testimony. In *Moore v. Beacon Transport, LLC*, No. 2018-06-1503, 2021 TN Wrk. Comp. App. Bd. LEXIS 39 (Tenn. Workers' Comp. App. Bd. Oct. 29,

In the present case, Employer argues the trial court failed to consider "the *Edwards* factors" in its assessment of the expert medical proof. In its view, in circumstances where an employee is diagnosed with a relevant preexisting condition, *Edwards* requires a trial court to consider: (1) whether the employee was symptomatic or asymptomatic prior to the work accident; (2) whether the employee was experiencing any functional limitations caused by that preexisting condition prior to the work accident; and (3) whether the evidence reveals any "anatomic change" to the body part(s) in question after the work accident. *See id.* at *22-23. Although we agree that the factors Employer cites are relevant to the analysis, that list is not by any means exhaustive, and a trial court should consider all other relevant factors in assessing whether a work-related accident has materially advanced, aggravated, or accelerated a preexisting condition to the point that the need for medical treatment and/or any resulting disability arises primarily from that work accident.

During his deposition, Dr. Lanford was asked whether the work-related motor vehicle accident was the primary cause of the need for the surgery he had recommended. With respect to evidence of Employee's preexisting degenerative conditions, the following exchange occurred:

Q. In your opinion[,] within a reasonable degree of medical certainty, do you have an opinion about whether she would need this surgery at this juncture of time if not for the car crash?

A. Assuming the car crash is when the onset of her symptoms occurred, then I feel that the car crash is the reason she's having surgery, yes.

Q. . . . . [T]he diagnostic files showed degenerative findings?

A. Absolutely.

Q. Ms. Allen was 46 years old when you saw her?

A. Yes . . . . Degenerative changes [are] very common at 46 years old. A severe spinal stenosis C3 to 7 at 46 years old is uncommon.

Q. Is that a condition that can be asymptomatic?

A. Yes.

---

2021), we had previously decided, again in a split decision, that binding precedent requires an appellate court to review a trial court's decision to give greater weight to one expert opinion over another under an abuse-of-discretion standard, regardless of the form of the evidence presented. Although that is the standard we are using in the present appeal, we recognize that the applicable standard of review of expert evidence is an issue to be addressed by the Supreme Court in *Edwards*.

Q.      And based on Ms. Allen's history, in your opinion to a reasonable degree of medical certainty, can you say whether or not it appeared to be asymptomatic in this case up to the car crash?

A.      When you say "asymptomatic," this is totally based on her history. She states she had no symptoms prior to the accident, so I would say she was asymptomatic assuming she's giving an accurate history.

Q.      And can you say based on her history whether or not this crash caused the asymptomatic condition to become symptomatic?

A.      Again, if her history is accurate, I totally believe that's what caused her symptoms to become clinically real.

. . . .

Q.      And in your examination, did you see anything that you noted in your record to give you a suspicion that she was malingering or not being honest?

A.      She had objective findings on her imaging studies that show her symptoms should be totally consistent with what she complains about.

During cross examination, when questioned about his causation opinion, Dr. Lanford stated, "I think her history is consistent with a trauma and a spinal cord injury."[4]  When asked whether the work-related accident was the "straw that broke the camel's back," Dr. Lanford responded, "it's what caused her to have surgery, yes."  Thereafter, Dr. Lanford testified:

> Yes, you will see patients that come in with severe cervical spinal stenosis that are asymptomatic; by her history, that's where she was.  And I wouldn't recommend surgeries to . . . one who had no symptoms, a prophylactic surgery of some sort unless they were – let's say they were a professional football player, okay . . . . [Those in] the general population who are doing normal occupations that don't require repetitive collisions of the head, I don't see a reason to say prophylactically you are going to operate on someone when they are asymptomatic.

Finally, Dr. Lanford was asked during cross examination to review the report of Dr. John Burleson, an orthopedic surgeon.  When asked about Dr. Burleson's opinion

---

[4] Dr. Lanford also testified during cross examination that "[w]hen I'm asked for a causation opinion, I'm giving it more than 50 percent."

that Employee's preexisting conditions were 75-80% the cause of the need for surgery, with only 20-25% of the cause attributable to the work-related accident, Dr. Lanford testified he disagreed with that opinion. Dr. Lanford commented that Dr. Burleson apparently did not recognize or consider her cervical myelopathy. He also disagreed with Dr. Burleson's opinion that Employee would have needed the surgery regardless of the motor vehicle accident. He testified it would be "totally speculating" to opine as to when and if Employee's condition would have progressed to the point of needing the kind of surgery he believed she needed after the motor vehicle accident.

Employer presented Dr. Burleson's deposition testimony, who completed a records review and medical examination at Employer's request. Dr. Burleson testified he had recently completed a physician certification program sponsored by the Bureau of Workers' Compensation that included training in evaluating causation issues in the context of workers' compensation claims. In this case, Dr. Burleson stated that, after reviewing Employee's prior medical history in light of her current cervical spine condition, he considered her prior complaints of left arm numbness and tingling "as being potentially related." With respect to a 2017 CT scan that had been ordered in the context of the dental abscess, Dr. Burleson commented he reviewed the images and saw evidence of "significant arthritis" in the cervical spine. He described seeing "things that might indicate chronic pathology." However, he acknowledged that those scans did not show the spinal cord itself or the cervical discs with sufficient clarity to evaluate them.

With respect to preexisting symptomatology, Dr. Burleson admitted that the 2017 CT scan was not determinative. According to Dr. Burleson, if a patient with those objective findings reported numbness and tingling in the arm, he would agree such symptoms *could be* consistent with a cervical condition, but he also acknowledged it could also be an incidental finding in a patient being evaluated for some other medical condition, such as a dental abscess.

Dr. Burleson was also asked about 2020 records from Skyline Medical Center indicating that the patient had reported "chronic neck pain" during a visit where she was being treated for hip and low back complaints following a fall. According to Dr. Burleson, "it just gave us a point in time where she had reported to the provider there that she has had chronic neck pain." Dr. Burleson acknowledged there was no "clear definition" as to the meaning of the word "chronic" in that context.

Next, when asked whether the prior medical records he had reviewed indicate Employee "had symptoms of cervical stenosis prior to the work accident," Dr. Burleson responded, "yeah, I think it's likely . . . . Is it possible she had peripheral neuropathy? It is. I wasn't there, and I can't say with certainty, but it's likely."

As noted above, Dr. Burleson expressed the opinion that the primary cause (75-80%) of the need for cervical spine surgery was her preexisting degenerative condition,

with the work-related motor vehicle accident being a minor, secondary cause (20-25%). As Dr. Burleson explained, "we think that's from a compilation of maybe minor insults from just turning your head and the disc wearing, and eventually there's kind of a straw that broke the camel's back. It's just enough now that all of a sudden a threshold has been reached where the nerve is firing."

During his physical examination, Dr. Burleson found no evidence of myelopathy, unlike the findings of Dr. Lanford and the MRI results. Dr. Burleson saw evidence of cervical degenerative disc disease from the C3 to the C7 levels, including both arthritis and stenosis. He also saw evidence of a large disc osteophyte at the C4-5 level. Ultimately, he agreed that Dr. Lanford's proposed surgery was "very sound and reasonable" based on the evidence presented. He disagreed with Dr. Lanford's opinion as to the primary cause of the need for that surgery.

During his cross examination, Dr. Burleson admitted that the 2015 medical records regarding left arm numbness indicated a diagnoses of left arm tendonitis, and there was "no indication anywhere in the medical records that the 2015 problem was coming from her neck." Similarly, the 2019 records indicating that she was evaluated for stroke-like symptoms also contained no reference to a neck or cervical spine diagnosis. Finally, Dr. Burleson acknowledged there are no records between the 2020 records and the 2023 work-related accident indicating any additional complaints or progression of her cervical spine condition. Moreover, Dr. Burleson admitted that the work accident could be considered "the inciting event where she became symptomatic." Yet, he maintained that "she was 90 yards down the field staring at the end zone" when the work accident occurred.[5]

Finally, we note that Employee did not testify during the expedited hearing. Instead, her affidavit was admitted into the record for the court's consideration, but it contained no information addressing Employer's allegation of prior relevant symptomatology.

*Application of Law to Facts*

Here, with respect to the issue of medical causation, we cannot conclude the trial court erred in accepting the presumptively correct opinion of the panel-selected authorized treating physician over that of Employer's experts. First, the preponderance of the evidence Employer presented suggesting prior symptoms was in the context of the

---

[5] In addition to Dr. Burleson's testimony, Employer also presented written reports from Dr. Kimberly Terry and Dr. Luc Jasmin, both Tennessee-licensed neurosurgeons. Dr. Terry completed a records review only and opined that "the current complaints and need for treatment including cervical surgery are not 50% or more causally related to the MOI/DOI of 4/26/2023." Similarly, Dr. Jasmin completed a records review and opined that "the current findings/diagnoses/complaints to the cervical spine are not greater than 50% causally related to the industrial incident of 4/26/23."

evaluation and treatment of body parts other than the cervical spine. These included the prior left arm injury, a dental abscess causing swelling in the area of the jaw and neck, and prior evaluation for stroke-like symptoms. In our view, there is insufficient evidence that any prior numbness, tingling, or pain in the left arm was related to a cervical spine condition.

Second, the only direct evidence Employer offered supporting its position of prior symptoms was a November 2020 medical record from Skyline Medical Center reflecting that Employee had complained of "chronic neck pain." Yet, the purpose of her visit in 2020 was for evaluation and treatment of her left hip and low back, and the provider did not evaluate or treat a neck condition. Although this evidence is supportive of Employer's position that Employee reported suffering from prior neck symptoms, there is no evidence that any such preexisting condition caused disabling symptoms or functional limitations prior to the work-related accident.

As a result, we cannot conclude the trial court erred in accepting Dr. Lanford's causation opinion over that of Dr. Burleson. There is competent medical evidence that the work accident either made a previously asymptomatic condition symptomatic or increased her symptomatology significantly. There is evidence that the motor vehicle accident caused or materially advanced her preexisting cervical condition. There is evidence that the motor vehicle accident, at a minimum, hastened the need for surgery. Moreover, although the trial court reviewed the reports from Drs. Terry and Jasmin, the court noted that they had no opportunity to examine Employee and, thus, that their causation opinions were of limited value. In short, we agree with the trial court that Employer failed to overcome the presumption of correctness afforded Dr. Lanford's causation opinion at this interlocutory stage of the case. Consequently, we conclude Employee came forward with sufficient evidence to show she is likely to be successful at a hearing on the merits.

## Conclusion

For the foregoing reasons, we affirm the trial court's order in all respects and remand the case. Costs on appeal are taxed to Employer.

10



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Heather Allen | ) Docket No.  2023-06-7576 |
| | ) |
| v. | ) State File No.  44213-2023 |
| | ) |
| Deliveries via ISG, LLC, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Joshua D. Baker, Judge | ) |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 29th day of April, 2025.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| A. Allen Grant<br>Benjamin T. Norris | | | | X | agrant@eraclides.com<br>bnorris@eraclides.com |
| Brian Dunigan | | | | X | brian@poncelaw.com<br>kfaig@poncelaw.com |
| Joshua D. Baker, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |



Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov